```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
ACCELECARE WOUND CENTERS, INC.,         :
                                        :
                    Plaintiff,          :
                                        :
          -v-                           :
                                        :    08 Civ. 8351 (DLC)
AMICUS HYPERBARIC GROUP, LLC, AMICUS    :
MEDICAL GROUP, LLC, AMICUS WEST TEXAS   :    OPINION & ORDER
HYPERBARIC L.P., AMICUS TEXAS           :
HYPERBARIC, LP, AMICUS ARIZONA          :
HYPERBARIS, L.P., AMICUS SOUTH TEXAS    :
HYPERBARIC, LP, AMICUS VALLEY           :
HYPERBARIC, LP, and JOHN R. HEDRICK,    :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X
```

Appearances:

For Plaintiff:

William S. Eggeling
Alfred A. Day
Ropes & Gray, LLP
One International Place
Boston, MA 02110

Caitlin M. Moyna
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036

For Defendants:

Alexander M. Kayne
Harvey Kurzweil
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019

DENISE COTE, District Judge:

This Opinion addresses a motion for partial judgment on the pleadings in this breach of contract action arising from a sale of health care businesses.[1]  On October 6, 2009, plaintiff Accelecare Wound Centers, Inc. ("Accelecare") filed a motion pursuant to Fed. R. Civ. P. 12(c) to resolve the following issues:  Whether any of three "Earn-Out Notices" provided by Accelecare to defendants Amicus Hyperbaric Group, LLC and related entities ("Amicus") were valid under the Asset Purchase Agreement ("APA"), and if so, whether Amicus timely objected to such valid notice.  The parties agree that if a valid Earn-Out Notice was provided and if Amicus timely objected, then the disputed Earn-Out calculation should be referred to a mutually agreed accounting firm for a final determination pursuant to the APA.  For the reasons that follow, only the Earn-Out Notice dated May 22, 2009 was valid, Amicus properly objected to that notice, and the Earn-Out calculation must therefore be referred to a mutually agreed accounting firm.

BACKGROUND

The following facts are taken from the parties' pleadings and the exhibits attached thereto.  On May 31, 2007, Accelecare

---

[1] Additional background concerning the underlying contract dispute is discussed in a May 5, 2009 Opinion.  See Accelecare Wound Centers, Inc. v. Bank of New York, Nos. 08 Civ. 8351(DLC) & 08 Civ. 11314(DLC), 2009 WL 1227487, at *1-*3 (S.D.N.Y. May 5, 2009).

2

entered into the APA with Amicus.[2]  Pursuant to the APA, Amicus was to transfer to Accelecare all of the assets of certain wound care and hyperbaric medicine management services (the "Centers") in exchange for $5,234,449 in cash, 248,528 share of Accelecare stock, and the assumption by Accelecare of certain liabilities and contracts.  A portion of the purchase price totaling $2,841,400 and a portion of the shares of Accelecare stock were placed in escrow (the "Escrow Property") to secure and fund the parties' respective obligations under the APA.[3]  On February 13, 2009, the Escrow Property was deposited in this Court's registry.[4]

Section 14 of the APA (the "Earn-Out Provision") requires Accelecare to pay Amicus additional compensation, *i.e.*, a bonus, if the Centers performed above a certain level following the acquisition.  Section 14.1(a) provides that the amount of the bonus is determined by an "Earn-Out Formula," which is based on a multiple of the incremental "EBITDA"[5] achieved at certain

---

[2] Section 16.1 of the APA provides that it is to be construed in accordance with Delaware law.

[3] Section 3.2(a) of the APA required that $520,700 be disbursed out of the Escrow Property to Amicus upon delivery of an unqualified audit opinion to Accelecare.  Amicus admits that this obligation has been satisfied.

[4] As of February 13, 2009, the Escrow Property was comprised of $2,397,706.12 in cash and 124,268 shares of Accelecare stock.

[5] EBITDA is defined as earnings before interest, taxes, depreciation, and amortization.

Centers during the "Measurement Period"[6] less the Centers' incremental debt, $1,656,000 in deferred debt, and $1,750,00 paid to Amicus as an advance on its potential bonus (the "Earn-Out Advance").  Accelecare was entitled to offset any amount it owed to Amicus under the Earn-Out Formula against any amounts that Amicus owed Accelecare pursuant to the APA.[7]

The notice provision on which this motion hinges is contained in § 14.1(b) of the APA.  Section 14.1(b) provides:

> Within thirty (30) days after the completion of Buyer's [i.e., Accelecare's] audit for fiscal year 2007 and fiscal year 2008, if applicable, Buyer shall deliver to Seller [i.e., Amicus] a statement reflecting its computation of the Bonus achieved for the Measurement Period (the "Earn-Out Notice").

(Emphasis supplied.)  Section 14.1(c), in turn, allows Amicus twenty days to object to Accelecare's Earn-Out calculation.  It provides:

> If within twenty (20) days of delivery of Buyer's [i.e., Accelecare's] computation, Seller [i.e., Amicus] has not given Buyer notice of any objections

---

[6] The "Measurement Period" is defined as: (i) twelve consecutive months following the Effective Date for those Centers open as of the Effective Date, or (ii) twelve consecutive months from the date that the Center opens for business; but in no event later than sixteen consecutive months from the Effective Date.  The Effective Date of the APA was May 31, 2007 and thus the end of the Measurement Period was no later than September 30, 2008.

[7] Section 14.1(a)(iii) of the APA provides:
> Buyer [i.e., Accelecare] may offset any amount owed to Buyer by Seller [i.e., Amicus] under this Section 14 against any amounts owed by Buyer to Seller in accordance with this Agreement, including, without limitation, funds available in the Escrow Account.

4

>to the computation, the computation will be final and
>binding.  If Seller gives notice of an objection, then
>any disputed issues will be submitted to a mutually
>agreed accounting firm and such firm shall make a
>determination with respect to any disputed amounts in
>accordance with this Agreement. . . .  The
>determination of the accounting firm shall be final,
>binding and non-appealable.

The APA specified the process by which Accelecare must provide the Earn-Out Notice, as well as all other notices and communications, to Amicus.  Section 16.4 of the APA provides:

>All notices and other communications hereunder shall
>be in writing and shall be deemed given when delivered
>. . . to the parties in the manner provided below: . .
>.  If to Seller [i.e., Amicus], to Amicus Hyperbaric
>Group, LLC, c/o James Bullard [("Bullard")] . . . with
>a copy to David S. Piper, Esq., Boyer & Ketchand, P.C.
>[("Piper")].[8]

(Emphasis supplied.)  Under § 15.1 of the APA, each of the Amicus parties, "on behalf of itself and its equity holders," designated "John R. Hedrick" ("Hedrick") as their representative for the purpose of, inter alia, "receiving notices and providing objections, if any, and all other communications with respect to the Bonus [i.e., the Earn-Out]."  Section 15.1 states that the purpose of appointing Hedrick as the Sellers' Representative is "to efficiently administer the rights and obligations of the Seller under the Transaction Agreements, and otherwise with respect to the transactions contemplated hereby."

---

[8] Piper was counsel to Amicus for the transaction.

5

Accelecare filed suit in this district on September 29, 2008.[9]  On November 7, 2008, Accelecare delivered an Earn-Out Notice (the "November 2008 Notice") to Amicus's prior counsel in this litigation, Brian Jackson ("Jackson")[10], and provided a copy to, inter alia, Piper.  Based on the performance of the Centers during the Measurement Period, the November 2008 Notice calculated that, instead of Accelecare owing Amicus a bonus, Amicus owed money to Accelecare.  Accelecare claimed that it was therefore entitled to all Escrow Property.  Amicus did not respond to the November 2008 Notice within twenty days.

On December 18, Amicus' counsel requested that Accelecare deliver the November 2008 Notice directly to Amicus' designated representative.  On December 23, Accelecare sent a second copy of the November 2008 Notice to Jackson, as well as to Bullard, Piper, and Hedrick (the "December 2008 Notice"), but maintained that the November 2008 Notice was valid and binding.  On January 12, 2009, Amicus' counsel sent a letter to Accelecare and its counsel stating that Amicus objected to the December 2008 Notice as untimely because Accelecare's 2008 audit had not been

---

[9] Amicus had filed suit against Accelecare in the Northern District of Texas on August 18, 2008, to establish its rights to a percentage of the proceeds from the escrow account. Amicus Hyperbaric Group, LLC v. Accelecare Wound Centers, Inc., No. 08 Civ. 098-C (N.D. Tex. filed Aug. 19, 2008).

[10] Jackson was replaced by present counsel for defendants as of August 26, 2009.

completed.  On January 23, Amicus' counsel sent another letter to object to Accelecare's valuation of its shares.[11]

On May 22, fifty-two days after the completion of Accelecare's 2008 audit on March 31, 2009, Accelecare delivered by courier a third Earn-Out Notice (the "May 2009 Notice") to Jackson, with copies to Amicus Hyperbaric Group, LLC, c/o James Bullard, and to Piper.  It did not send this third notice to Hedrick.  The Earn-Out calculation in the May 2009 Notice is identical to that in the November 2008 and December 2008 Notices.  By letter dated June 11, Amicus objected to the Earn-Out calculation and valuation of Accelecare stock in the May

---

[11] The valuation of the Accelecare stock is relevant because § 14.1(b) of the APA provides:

> If a Bonus has been achieved during the Measurement Period, the proceeds of such Bonus shall be paid eighty percent (80%) in the form of cash and twenty percent (20%) in the form of Shares (the "Share Portion") . . . .  The number of Shares to be paid . . . shall be equal to Share Portion (in dollars) divided by the fair market value of one Share as determined in good faith by Buyer and Seller; provided, however, that in the event that Buyer and Seller cannot agree on such valuation, Buyer and Seller agree to hire an independent third-party appraiser mutually acceptable to Buyer and Seller, said appraiser's valuation to be binding upon both Buyer and Seller.

Similarly, in the event that the bonus earned by Amicus is less than the Earn-Out Advance paid by Accelecare, § 14.2 of the APA provides that Amicus shall forfeit to Accelecare the number of shares equal to the difference between the Earn-Out Advance and the Bonus (the "Earn-Out Deficit") in dollars divided by the share price, which is to be determined in the same manner as provided in § 14.1(b).

2009 Notice.  Amicus faxed the objection to Accelecare on June 11, exactly twenty days after the third Earn-Out Notice was received on May 22, and sent another copy via certified mail.

On October 6, Accelecare filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) to determine the appropriate Earn-Out calculation that should be applied. Accelecare argues that the November 2008 Notice was valid and that because Amicus failed to object to it within twenty days, the Earn-Out calculation therein is binding.  In the alternative, Accelecare argues that the December 2008 and May 2009 Notices were valid, such that if the Court determines that Amicus properly objected to either notice, the Earn-Out calculation should be referred to a mutually agreed accounting firm.  In its October 23 opposition, Amicus argues that none of the Earn-Out Notices were valid, and in any case, Amicus properly objected within twenty days to the May 2009 Notice, which was the only Earn-Out calculation provided after the completion of Accelecare's 2008 audit.  Amicus agrees that if the May 2009 Notice was properly provided to Amicus, then the parties' dispute concerning the Earn-Out calculation should be referred to an independent accounting firm.  In addition, all parties agree that their dispute concerning the valuation of Accelecare's shares should be referred to a mutually agreed independent appraiser pursuant to the APA.

DISCUSSION

Under Delaware law, which the parties do not dispute applies here, a court's goal in interpreting a contract is to determine the shared intent of the parties.  Sassano v. CIBC World Mkts. Corp., 948 A.2d 453, 462 (Del.Ch. 2008) (citation omitted).  Delaware adheres to the "objective theory" of contract under which the court must look to the "most objective indicia of that intent: the words found in the written instrument."  Id.  In performing its review, the court must ascribe to the words their "common or ordinary meaning, and interpret[] them as would an objectively reasonable third-party observer."  Id.  "When the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation."  Id.  A contract is not rendered ambiguous simply because the parties in litigation do not agree upon its construction.  Comet Systems, Inc. Shareholders' Agent v. MIVA, Inc., 980 A.2d 1024, 1030 (Del.Ch. 2008).  "Rather, a contract term is ambiguous only when the provisions in controversy are reasonable or fairly susceptible of different interpretations or may have two or more different meanings."  Id.  The determination of whether the contract is ambiguous is a matter of law for the court to decide.  Id.

The only issues to be determined are whether any of the Earn-Out Notices were valid under the APA and whether Amicus timely objected to any such valid notice.  Amicus argues that Accelecare's November 2008 and December 2008 Notices were both invalid because they were delivered prior to the completion of the 2008 audit in violation of § 14.1(b) of the APA.[12]  Amicus is correct.

Section 14.1(b) provides in pertinent part: "Within thirty (30) days <u>after the completion of Buyer's audit</u> for fiscal year 2007 and fiscal year 2008, <u>if applicable</u>, Buyer shall deliver to Seller a statement reflecting its computation of the Bonus achieved for the Measurement Period (the 'Earn-Out Notice')." (Emphasis supplied.)  The unambiguous language adopted by the parties anticipates that a portion of the Measurement Period might extend into the time period covered by Accelecare's 2008 audit, which is precisely what happened here.[13]  The parties do not dispute that the Measurement Period ended on September 30, 2008.  As such, the Measurement Period included nine months of EBITDA results that were audited as part of Accelecare's 2008

---

[12] Amicus also argues that the November 2008 Notice was invalid because Accelecare did not send it to the Sellers' designated representative, Hedrick, pursuant to § 15.1 of the APA.  It is unnecessary to reach this argument because the November 2008, as well as the December 2008, Earn-Out Notices were sent prematurely.

[13] As described above, the Measurement Period was defined in the alternative with a maximum expiration date.

audit.  Thus, the results of Accelecare's 2008 audit were clearly "applicable."  Because the 2008 audit was not completed until March 31, 2009, Accelecare could not have provided a valid Earn-Out Notice prior to that date and therefore the November and December 2008 Notices were invalid.

Accelecare argues that the phrase "as applicable" in § 14.1(b) should be interpreted instead as recognizing that a valid Earn-Out Notice could predate the 2008 audit where "completion of the audit would add nothing to the computation."[14]  This interpretation, however, is not grounded in the text of the APA and would render meaningless the requirement that the Earn-Out Notice be provided within thirty days of the completion of the 2007 and 2008 audits, a result which is to be avoided. See, e.g., Council of the Dorset Condo. Apartments v. Gordon, 801 A.2d 1, 7 (Del. 2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole."); see also O'Brien v. Progressive Northern Ins. Co., 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does

---

[14] Conversely, Accelecare argues that phrase "as applicable" in § 14.1(b) should be understood to be "anticipating the possibility that the Measurement Period might not be concluded until after Accelecare's 2008 Audit had been completed."  As Accelecare concedes, however, based on the Effective Date of May 31, 2007, the latest date contemplated by the APA for the EBITDA measurements was the end of September 2008.

not render any provision illusory or meaningless." (citation omitted)).

Accelecare does not argue that it was able to provide a valid Earn-Out Notice within thirty days of the completion of its 2007 audit such that the completion of the 2008 audit was not "applicable."  Moreover, the 2008 audit was clearly relevant since nine months of EBITDA results included in the Measurement Period were covered by the 2008 audit.  The plain and unambiguous wording of § 14.1(b) thus required Accelecare to await the completion of its 2008 audit to deliver the Earn-Out Notice to Amicus.

Accelecare contends that the computations in the November 2008 and December 2008 Notices were based on data that "had been through the sieve of its audit process," and therefore there was no need to wait for the completion of its 2008 audit before providing the Earn-Out Notice.  Even if the 2008 audit did not result in any changes to the EBITDA measurements or the Earn-Out calculation, as Accelecare argues, by adopting § 14.1(b) the parties agreed that Accelecare would provide the Earn-Out notice after the "completion" of the applicable audits, and because the results of the 2008 audit were relevant here, the November 2008 and December 2008 Notices were provided prematurely.  The APA adopted a clear timetable for its notice regime and Amicus is entitled to the enforcement of that timetable.

Unlike the November 2008 and December 2008 Notices, the Earn-Out Notice dated May 22, 2009 was provided after the completion of Accelecare's 2008 audit, as required by § 14.1(b). Pursuant to § 16.4, Accelecare sent the May 2009 Notice directly to "Amicus Hyperbaric Group, LLC, c/o James Bullard," and to Piper and Jackson.[15]  Amicus objected to the May 2009 Notice by letter dated June 11, 2009, within the twenty days required under the APA.  Accordingly, pursuant to § 14.1(c), the issues disputed in the June 11, 2009 letter must be submitted to "a mutually agreed accounting firm" who shall "make a determination with respect to any disputed amounts in accordance with [the APA]."  As the parties agreed, the determination of the accounting firm shall be "final, binding and non-appealable."

Amicus argues that the May 2009 Notice was invalid for two reasons:  first, Accelecare did not send it to the Sellers' designated representative, Hedrick, as required by § 15.1 of the APA; and second, the notice was sent more than thirty days after the completion of Accelecare's 2008 audit.  Neither argument is availing.

With respect to Amicus' first argument, the Earn-Out Notice, like all notices under the APA, was to be "delivered" to

---

[15] As discussed above, § 16.4 of the APA provides, inter alia, that "[a]ll notices and other communications hereunder . . . shall be deemed given when delivered" to "Amicus Hyperbaric Group, LLC, c/o James Bullard" with a copy to "David S. Piper, Esq."

Amicus and its designated attorney pursuant to § 16.4, that is to Bullard and Piper.[16] Section 15.1, however, appoints Hedrick as the Sellers' representative who is to "receive" the Earn-Out Notice. While there is some tension between these two provisions, such tension can be resolved through a close reading of the text and consideration of the purpose behind these two provisions.

First of all, the plain language of § 15.1 does not require that Accelecare "send" the Earn-Out Notice to Hedrick.[17] Section 16.4, on the other hand, clearly directs that "[a]ll notices" to Amicus "shall" be "delivered" to Bullard and Piper. Thus, § 15.1 simply does not speak to the means by which Accelecare was to provide the Earn-Out Notice to Amicus, which is instead governed by § 16.4. The ostensible purpose of § 16.4 is to ensure that all notices to Amicus are delivered to the proper authority at the company, as well as to its counsel, so that Amicus could respond appropriately. Such purpose was fulfilled by having Accelecare deliver the Earn-Out Notice to Bullard and

---

[16] Section 14.1(b), the Earn-Out Notice provision, similarly states that "Buyer <u>shall deliver to Seller</u> a statement reflecting its computation of the Bonus achieved for the Measurement Period." (Emphasis supplied.) As provided in § 16.4, notice to the Seller was to be delivered to Bullard and Piper. Notably, § 14.1(b) does not state that Accelecare shall send the Earn-Out Notice to "Sellers' Representative."

[17] As noted above, Accelecare had sent the December 2008 Notice to Hedrick in response to a specific request from Amicus that it do so.

Piper.  The stated purpose of § 15.1, by contrast, is "to efficiently administer the rights and obligations of the Seller under the Transaction Agreements," including inter alia, "receiving notices and providing objections, if any, and all other communications with respect to the Bonus."  This purpose was fulfilled by having the various Amicus parties relinquish their individual right to receive copies of the Earn-Out Notice, as well as their right to make any objections on their own behalf, and instead vest such authority in a single individual, namely Hedrick.  Reading § 15.1 and § 16.4 together, and keeping the purpose of each provision in mind, the scheme envisioned by the APA appears to be that Accelecare would send the Earn-Out Notice to Bullard and Piper, who would ensure that Hedrick "received" the notice so that he could make any objection on behalf of all Amicus parties.  Thus, Accelecare was not required by § 15.1 of the APA to send the Earn-Out Notice directly to Hedrick, but instead to Bullard and Piper pursuant to § 16.4.

With respect to Amicus' second argument, although § 14.1(b) states that the Earn-Out Notice shall be provided "[w]ithin thirty (30) days" after the completion of Accelecare's 2008 audit, and the May 2009 Notice was received twenty-two days after that deadline, this delay does not invalidate the notice. The APA does not specify any consequence, adverse or otherwise, of a failure to abide by § 14.1(b)'s literal terms.  The purpose

15

behind this provision was ostensibly to ensure that the notice was provided within a reasonable time to allow the parties to finalize the Earn-Out calculation in an efficient manner. Amicus does not argue that it was prejudiced by Accelecare's failure to provide the Earn-Out Notice within thirty days. Indeed, this was the third identical notice that Amicus received from Accelecare.  Further, Amicus objected to the May 2009 Notice within the twenty days required by § 14.1(c) and thereby invoked its right under the APA to have the Earn-Out calculation determined by an independent third-party accounting firm. Accelecare's failure to provide the May 2009 Notice within the thirty days specified in § 14.1(b) is therefore immaterial and the dispute between the parties concerning the Earn-Out calculation is ripe for resolution by an independent accounting firm.

CONCLUSION

Accelecare's October 6, 2009 motion for judgment on the pleadings is granted in part and denied in part. The parties shall refer the Earn-Out calculation to a mutually agreed accounting firm and shall refer the valuation of Accelecare shares to a mutually agreed independent appraiser.

SO ORDERED:

Dated:   New York, New York
         December 15, 2009

*[signature]*
DENISE COTE
United States District Judge